No. 2940.

## ALEXANDER MEULY v. THE STATE.

26a 274
26a 642
27a 620
26  274
28  136
29  231
29  241
26  274
30  128
30  459
30  557
30  566
31  166

1. PRACTICE.—CHANGE OF VENUE was sought by the defendant in this case upon the ground that the prejudice against him in the county of the forum was so great that he could not obtain a fair and impartial trial. The affidavits of his compurgators were traversed by counter affidavits on behalf of the State. A large number of witnesses testified *pro* and *con* as to the credibility and means of knowledge of the defendant's compurgators, and, over the objection of the defendant—who contended that the investigation should be confined solely to the credibility and the means of knowledge of his compurgators—the trial court permitted the contesting witnesses to testify directly as to the existence or non-existence of the prejudice alleged in the affidavits supporting the application for the change of venue. *Held* that the proceeding was correct, and the objection was properly overruled.

2. SAME—CHARGE OF THE COURT.—The rule is imperative that the trial court must give in charge to the jury, fully and affirmatively, the law applicable to every issue raised by the evidence, whether such evidence be produced by the State or the defense, whether it be strong or feeble, and whether it be unimpeached or contradicted.

3. SAME—SELF DEFENSE.—Under the law of this State, a person has the right to defend himself against any assault or threatened assault upon his person calculated to inflict death or serious bodily injury, and it is not essential to his perfect right of self defense that the danger be real or actually exist, if it be apparent. If it reasonably appears from the circumstances of the case that danger existed, the person threatened with such apparent danger, has the same right to defend against it, and to the same extent, that he would have if the danger was real.

4. SAME.—But if a party by his own wrongful act brings about the necessity of taking the life of another to prevent being killed himself, he can not justify upon the ground of necessary self defense, and the killing will be imputed to malice, express or implied, by reason of the wrongful act which brought it about, or the malice from which it was done. The rule is that a person can not avail himself of a necessity which he has wilfully and knowingly brought upon himself.

5. SAME—PERFECT AND IMPERFECT SELF DEFENSE—CHARGE OF THE COURT.—The rule as to perfect self defense is, however, limited by the intention of the party producing the necessity to take life. If his intention was not *felonious*, then the homicide which his necessity compelled will not be murder. When, therefore, the evidence on a trial for murder is such as is calculated to raise a question as to the character of the intent with which the difficulty was provoked by the accused, it becomes the duty of the trial court to instruct the jury fully as to the distinction between perfect and imperfect self defense.

6. SAME.—The doctrine has been established in this State that where there are more assailants than one, the slayer has the right to act upon the hostile demonstrations of either, and to kill either, if it reasonably appeared to him that they were present, acting together to take his life or do him serious bodily injury. The doctrine is also well established that the "right of self defense is not impaired by mere preparation for the perpetration of a wrongful act, unheralded and unaccompanied by any demonstrations, verbal or otherwise, indicative of the wrongful purpose." But see the opinion in extenso, and the statement of the case, for evidence *held* to demand of the trial court a charge upon both perfect and imperfect self defense.

7. SAME—MANSLAUGHTER—ADEQUATE CAUSE.—An illegal attempt to restrain a person of his liberty, even under color of legal process, is such provocation as will reduce murder to manslaughter. See the opinion for the substance of evidence *held* to raise the issue of illegal restraint, and therefore to demand of the trial court a correct charge thereon. Note also that, under the evidence in this case, the trial court should have instructed the jury upon the defense of manslaughter as predicated upon a killing under the influence of terror produced by an adequate cause.

APPEAL from the District Court of Webb. Tried below before the Hon. J. C. Russell.

The appellant, being convicted in the second degree for the murder of H. Douglas, in Webb county, Texas, on the twenty-ninth day of March, 1886, was awarded a term of ten years in the penitentiary.

Antonio B. Ayala was the first witness for the State. He testifies that he had resided in the city of Laredo, Webb county, Texas, since 1875. He knew H. Douglas, who, about three years prior to this trial, died in Orfila's saloon, Laredo, from the effects of a pistol shot fired by the defendant. The fatal shot was fired in the early moning, just as day was breaking. A very short time before the shot was fired, the witness awakened from his sleep in a chair in the billiard room, which was in the rear of the bar room. He at once collected the billiard balls, put them away, and went into the bar room. He saw Douglas and Burbank talking to each other at the bar counter. Shortly afterwards the defendant came in and spoke to somebody. Then Douglas said something. Then defendant spoke again and then shot Douglas dead, while he, Douglas, was talking to him. Defendant then, holding the pistol in one hand, covered Burbank with it, and placed his left hand on Burbank's waist. He and Burbank talked to each other, Burbank back-

ing until he got to the door, when he went out. The witness did not know what either of the parties said to the others at any time. A negro named Rogers came to the door and opened it just before Burbank went out. He thrust his head in the door, but did not enter the saloon. After Burbank left the saloon, the defendant walked back to the counter and got his coat. Fernando Gomez, the bar tender, then said: "That man is not in fault," but witness was unable to say whether he referred to the defendant, Douglas or Burbank. When defendant left the saloon he went towards the Commercial hotel, but witness did not know that he went there. Burbank and Douglas were at the bar talking to each other when the witness entered the bar room from the billiard room. Fernando was then present, but witness did not then see the defendant. The witness then went to the end of the counter on which the water cooler was sitting, and stood there facing the front door with his back to the billiard room. Present.y the defendant, with a large pistol in his hand, came. Douglas was then standing with his back touching the counter and his right arm resting on it, and was in that position when, a few moments later, he received the fatal shot. The witness did not see Douglas, who was drunk, draw or attempt to draw a weapon. Defendant shot Douglas from a distance of about six feet, and Douglas fell dead without a groan. The negro Rogers thrust his head into the saloon while defendant was trying to take Burbank's pistol, but did not come into the saloon until some time after the shooting.

Cross examined, the witness said that, at the time of the killing, he was in the employ of Mr. Orfila as the driver of his accommodation hack. Witness could not locate the hour of the shooting any nearer than that it was after four o'clock a. m. It occurred immediately before the witness took his hack out, and he did not take the hack out until after four o'clock. When the witness first went to the saloon on that morning the defendant and Burbank were playing pool. Riverton was there keeping the game, and Douglas was in the pool room talking to somebody—witness did not know who. The pool game was finished when the witness woke up. He then gathered up the billiard balls, and went into the bar room, and, as stated, took his position, standing at the end of the bar counter behind the water cooler, facing the front door and the counter lengthwise, with the door in the partition wall separating the bar and billiard rooms at his back. This statement, the witness declared,

harmonized with his previous testimony delivered on the judicial investigation of the killing [habeas corpus?] in the court at Brownsville. At the time of the shooting, Fernando, the bar keeper, was the person present who was remotest from the witness. Witness, from where he stood, could only see Douglas's head and shoulders, and the elbow of his right arm which rested on the counter. Douglas's left arm was toward the street, on the side opposite from witness. Douglas spoke to the defendant before the defendant addressed him. Then the defendant spoke, and just as Douglas was about to speak again the defendant fired. Witness understood nothing said by either Douglas or defendant. Defendant spoke in a very rapid tone of voice when he came in, but witness was unable to say whether or not he was irritated. Witness heard Burbank's name used in the talk which immediately preceded the shooting. Rogers came to the door within half a minute after the shot was fired. Witness saw Douglas fall, but did not go to him. After defendant left, the witness left the saloon to tell Mr. Orfila of the homicide. Defendant left the saloon by way of the yard, and witness left it through the front door, the same one by way of which Burbank left it. He saw no person outside in front of the saloon, except a boy asleep in a hack. He left no person in the saloon except Fernando. When defendant came into the saloon just before the shooting, he had the pistol in his right hand, holding it down by his side. Defendant spoke as soon as he entered the saloon, and stopped in front of Douglas, but witness did not know whether he spoke to Douglas or Burbank. Douglas, who was talking to Burbank when defendant entered the saloon, turned and faced defendant as soon as defendant spoke.

H. A. Burbank was the next witness for the State. He testified as follows: "I live in Laredo, Texas. I knew H. Douglas. He is dead. He died on the twenty-ninth day of March, 1886, in the Commercial saloon in Laredo, Texas, from the effects of a shot fired from a six shooter pistol by the defendant. I don't think that Douglas lived a minute after he was shot. He was standing at the bar next to me when he received the fatal shot. Mr. Meuly, just after dark on that evening, sent to my office for me to come down and play pool with him. I sent him word that I would be busy until after the mail was distributed. A little after ten o'clock I went to the saloon and found the defendant and L. E. Riverton. Meuly and I commenced to play

pool, Riverton keeping the game. We played until four or a little after four o'clock on the next morning. At the close of the game something was said about the pool balls not being correct. Meuly said that there was only fourteen balls being played from, and I said there were fifteen. Meuly then recounted the balls and found fifteen. I then said that we would not count the last game, which was for fifty dollars, and which I had won, and that he would call the debt what it was before the last game was played, which was sixty dollars. Meuly said: " All right! I will give you a check for the amount in the morning." I replied: " All right. Let us all go and take a drink." As well as I can remember we all went out of the billiard room into the bar room, I first, Douglas next, Riverton next, and I think Meuly was the last. I asked what they would take to drink. Meuly said he would not take anything. I then asked the bar keeper how much we owed for the use of the table and for the drinks we had taken while playing. At the same time I asked him for my pistol, which I always left behind the bar. He brought the paper on which he had the account, and my pistol, and gave them to me. Douglas then called for a whisky toddy and I for a glass of porter.

"As well as I can now remember, I was at that time standing next to the water cooler, which was at the west end of the counter and facing the counter. Douglas was on my right, and Riverton back of us in the center of the bar room. Meuly walked around and passed to the right of all of us, put two nickels on the counter and called for a cigar. He then turned and walked over to and said something to Riverton. I could not hear what he said. Riverton then walked out of the door fronting east, and Meuly walked up and down the room in front of the door, and in a few minutes I saw something handed in at the door to Meuly. Meuly then ran around to the side where I was standing, threw his six shooter down on me, and said to me: 'Throw up your hands and defend yourself,' or 'yourselves,' I can not say which. The words had no sooner left his mouth than he fired and Douglas threw up both hands and fell. I jumped toward Meuly, caught hold of him with my right hand by the vest, and with my left hand by his right hand or the pistol, I can't tell which. His left hand being disengaged, he immediately caught hold of my pistol, which was protruding from my pants in front, and hollowed to me to turn it loose. I then asked him if he wanted to murder me. He answered that if I didn't get out of there

he would blow me into eternity—or something to that effect. I turned him loose and jumped out of the door, expecting to receive a shot, but there was none. When I got outside I turned and looked through the second door into the saloon, and saw Meuly standing there looking toward Douglas, who was lying on the floor. I then ran up to the house of City Marshal Boyard, woke him up, and he and I returned to the Commercial hotel, and Boyard went up stairs and arrested Mr. Meuly.

"Douglas was shot immediately under the left nipple, the ball passing out of his body under the right shoulder blade. He did not speak after he fell. Riverton, the same man who is now in attendance upon this court, is the man who counted the pool game for Meuly and I. There was a short conversation between Meuly and Douglas during the progress of the game. Douglas remarked that he would bet twenty-five dollars that I would win the game. Meuly then told Douglas to put up his money, and I think he told him that if he did not have the money to put up, to shut up. When we commenced the game there were fifteen balls in the basket or bottle, and at the conclusion of the last game Meuly said that there were only fourteen balls in the bottle, and asked me to count them. I told him that I did not see how that could be, and during this time he recounted them and found fifteen balls. It was on account of this incident that I canceled the last game, which was for fifty dollars, and which I had won, and said that we would hold the debt at the original sixty dollars which he was owing me on the games which preceded the last one. I couldn't tell what Douglas said about the balls. I couldn't say certain, but he made one or two remarks that evening about betting. At different times during the night Douglas would ask me how many I had or how many pins I had made, and sometimes he would 'peg.' I do not know whether he 'pegged' all the time or not, I paid no attention to him, as Riverton was keeping the game on the string. I do not know who Douglas came to the saloon with; he came after I got there. He was under the influence of liquor. I did not see from whom Meuly got the pistol."

Cross examined, the witness testified substantially as follows: "I had known Meuly for several years before that night; Mr. Riverton only a few weeks. A moment after Meuly received whatever was handed to him through the door, he ran around with a pistol. I do not think he had it before. He did not go out to get it. He walked very fast, passed Douglas

and myself, and then turned on us. Douglas was facing the counter when Meuly came around. He turned to face Meuly, and so did I. Meuly said nothing until he reached the position I speak of, on my right. He then said: 'Throw up your hands and defend yourself' or 'yourselves.' I don't remember that Douglas said anything. I think, if he had said anything, I would remember. Meuly had his pistol in his hand when he passed us, but it was not then pointed at anybody. I could not tell which of us he first pointed the pistol at. Douglas and I were side by side, and Meuly was about four feet from us, and I could not tell which of us he first covered with the pistol. I remember of nothing else said by Meuly than that what I have stated. I said nothing. When I got my pistol after coming out of the billiard room, I put it in my waist, in front on the right side, and all the parties were then in the room. This was before we got the drinks. Menly got his pistol a few minutes after he spoke to Riverton. The pistol was handed in at the door to Meuly. I did not know that Meuly was at all hard of hearing. I don't know whether Douglas and Meuly ever met before that night. I do not remember that Meuly said anything to me about the money when he came in with the pistol. I have no recollection of Douglas saying anything to me about getting my money. I considered myself competent to take care of myself, and paid no attention to Douglas, if he said anything. We had been playing but a short time when Douglas came to the saloon. He was in the saloon at two o'clock and from that hour on until four. I saw somebody outside when I got out of the saloon, but did not know who it was. It was the east door I looked through into the saloon after I got out. I then saw nobody but Meuly and Douglas. I did not see Antonio Ayala during the difficulty. I had known Douglas for some time, and had never known him to carry a pistol, but I have heard that a pistol was found on his dead body. I had seen him drunk before that night. There were no hard words said about the balls that night, and I have no recollection of hearing Meuly or Douglas speak of them to each other. I don't remember Douglas leaving the room and returning. I don't remember that any of his friends came and coaxed him away, and that he came back. It was a closed glass door through which I looked after getting out of the saloon. I did not know what to think when Meuly came up with his pistol. I don't recollect testifying on the hearing in Brownsville that I

kept a sharp eye on him. I was considerably excited when I saw that he had a pistol. Riverton kept the pool game by agreement of myself and Meuly. Douglas's pegging had nothing to do with the game. To Douglas's proffer to bet twenty-five dollars, Meuly asked: 'Does it go?' and Douglas said that he did not have the money. The game in which the question about the balls arose was not played over. After shooting Douglas, Meuly seized my pistol and told me to let it loose, and I told him that he had it. I did not say that I was an officer and had a right to carry it. Meuly did not follow me out of the saloon. I was then postmaster."

P. T. Rogers was the next witness for the State. He testified that he was standing at the north post of the Wilson Hotel gallery when the fatal shot was fired, and from that point saw the transaction. He had just been into the saloon to get an "eye opener," and when he left there Meuly and Burbank were playing their last game of pool. Besides them, Mr. Riverton, Mr. Douglas, Fernando, the bar keeper, and Ayala were in the saloon and billiard hall. Witness walked up and down the gallery while the last game of pool was being played. He was leaning against the post when Burbank, Douglas, Riverton and Meuly came from the billiard room into the saloon. Douglas and Burbank walked up to the bar about the time that Meuly and Riverton got into the bar room. Riverton stood midway in the room, about six feet from the bar. Meuly said something to him, and Riverton left the saloon and went in the direction of the Commercial hotel. During Riverton's absence Meuly walked up and down the bar room. Riverton returned within a minute and a half, bringing something—witness did not know what—in his hand; Meuly met him at the door and turned back into the saloon immediately, and passed beyond the sight of the witness. Within a very short space of time the witness heard a report, saw the flash of a pistol, and then saw Douglas throw up his hands and fall backwards. Witness ran to the saloon at once, and saw Burbank advancing upon Meuly, who had a pistol in his hand. About that time Burbank said: "Don't shoot this man; he is my friend." Meuly replied: "I don't care who he is; I will kill him." Burbank then got within reach of Meuly, who was backing southwards from the counter, and Meuly grabbed the pistol in Burbank's waist, and said: "I want this pistol." A struggle then ensued for possession of the pistol. Burbank was holding it in his pants, and

Meuly was struggling to get it with his left hand while he held his own pistol in his right hand cocked. In that manner they struggled until they reached the east door, when Burbank asked Meuly: "Do you intend to murder me?" Meuly replied: "No, but you turn this pistol loose, or I will blow your head off." Witness then threw the east door open and Burbank rushed out, and the witness rushed out behind him. When shot, Douglas was facing west, leaning his right elbow on the counter and reeling like a windblown reed. He was beastly drunk. Riverton stood at the door only long enough to give Meuly whatever it was he brought, and then turned his steps towards the Commercial hotel. Riverton was not in or about the saloon when the fatal shot was fired. He may have been in the Commercial hotel.

Cross examined, the witness said that he was born in Montreal, Canada, but had been in Texas since 1876. He had lived in Laredo about three and a half years when Douglas was killed, and at that time was porter at the Wilson hotel. It was about four o'clock when the witness went into the saloon to get his "eye opener," and saw Meuly and Burbank playing the last game of pool. It was not yet broad daylight, but the morning was clear, and it was light enough for the witness to see and recognize a person twenty or thirty steps off. Witness stayed in the saloon about ten minutes and then returned to the gallery of the Wilson house, which he promenaded for a while and finally leaned up against the gallery post. From that position he could and did see into the saloon, all of the parties in it, the screen doors and all of the bar counter, except about two feet at each end. The door through which the witness saw into the saloon faced south, and was at the southeast corner of the saloon building. Riverton went out at the east door just after Meuly spoke to him, which was two or three minutes before the shooting. During Riverton's absence Meuly promenaded the saloon in front of the door through which the witness was looking. During the same time Burbank and Douglas were standing at the counter, about two feet apart, facing each other. Riverton soon came back from toward the Commercial hotel, and advanced to the door from the outside, having something in his hand. At the same time Meuly advanced toward the same door from the inside. Witness did not see Meuly and Riverton meet. Riverton almost immediately turned back toward the Commercial hotel. Meuly turned toward the west end of the saloon

and passed out of the witness's sight. Douglas and Burbank
had not then changed their positions at the counter. About
half a minute after Meuly went toward the west end of the
saloon from the door, the fatal shot was fired. Witness went
at once to the saloon and saw the incidents of the transaction
after the shooting, as stated on his examination in chief. He
did not see Burbank make any motion to defend himself before
the shot was fired. He did not see Burbank get his pistol and
put it in his waist. He did not see Meuly after Meuly left the
door, just before the shoot'ng, until he, witness, got into the
saloon. He did not then stop at the door, but went into the
saloon, past the dead man, and to the west end of the counter,
and at that time he saw Fernando and Ayala in the saloon.
The scuffle between Burbank and Meuly had not commenced,
but Burbank was advancing on Meuly. Meuly at no time ad-
vanced upon Burbank. When witness went out of the saloon
behind Burbank he saw one Placido and a hack driver asleep in
a hack, and had to shake them to awaken them. He met Riv-
erton a few moments afterward. Riverton then had something
in his hand, and asked witness where Meuly was, and witness
told him that Meuly was still in the saloon. The witness knew
that Burbank, after he left the saloon, did not stop and look in
at the east door. He ran on around the corner without stop-
ping. Of that fact the witness was positive. Douglas was dead
when Burbank said to Meuly: "Don't shoot that man; he is
my friend." Dick Moseley searched Douglas's body soon after
his death, and found a British bull dog pistol in his right hip
pocket. Witness went back into the saloon soon after he left
it, behind Burbank. He and Fernando then wakened Placido
and the hack driver, and sent them after Orfila, the owner of
the saloon. Ayala was then somewhere about the saloon.

The State rested.

Gregorio Llanos was the first witness for the defense. He
testified that on March 29, 1886, when Douglas was killed, he
was porter at the Commercial hotel. Meuly and Riverton were
stopping at that hotel at that time. Witness was in the hotel
office, awake, when the killing occurred. He heard a noise or
explosion about the time the shot must have been fired, but he
did not then recognize it as a pistol shot. About fifteen minutes
before that shot was fired, Mr. Riverton knocked at the hotel
door and witness let him in. Riverton asked for Christen's
pistol. Witness refused to let him have it, and he went up

stairs, remained about ten minutes and then came down and went out of the hotel. Witness did not observe, then, whether or not he had anything in his hand. About fifteen minutes after witness heard the noise or explosion, Riverton came back to the hotel, with a valise in his hands, and went up stairs.

L. J. Christen testified, for the defense, that Meuly arrived at the Commercial hotel on the evening before the killing of Douglas. Riverton had then been there about two weeks. Douglas was killed just before day light. The fatal shot awakened witness, who was sleeping in his room in the Commercial hotel. Witness reached the saloon about three minutes later, and found only three or four persons present. Riverton was not there. Witness then went back to his room to complete his toilet, and, while thus engaged, Marshal Boyard came and asked to be shown to Meuly's room. Witness went with him, and found Riverton and Meuly together in the room, and Boyard arrested Meuly.

Charles Meuly, the defendant's brother, testified, in his behalf, that the defendant was very hard of hearing in one of his ears, and that one of his eyes was defective.

L. E. Riverton, alias Reinhard, was the next witness for the defense. He testified that he lived in Chicago, Illinois. He was in Laredo on March 29, 1886, under the name of L. E. Riverton, his right name being Reinhard. He was traveling under an assumed name because of a difficulty he had in the north with a man and a woman. He was not then a fugitive from justice, but was then, as he is now, the manager of the largest retail hat store in Chicago. Douglas was killed about five o'clock a. m., on Monday, March 29, 1886. Prior to that time, the witness met Meuly in Monterey, Mexico. On Sunday evening, Meuly came to the Commercial hotel and asked for a room. The hotel being full, the witness offered him sleeping quarters in his room, which he accepted. After supper, a gentleman named Campbell called on Meuly, and after a time proposed taking a drink. Witness, Meuly and Campbell went into the adjoining saloon and took a drink, and then walked up the street, and, at a corner about two blocks distant, met Burbank. Meuly and Burbank then arranged to play pin pool for five dollars a game. The witness, Meuly and Campbell then went back to the Commercial saloon, where, at about nine o'clock, Burbank joined them, and the pool game between Burbank and Meuly began. The narrative of this witness from this point

until Burbank left the saloon, after the killing, is transcribed in detail in the opinion of the court.

Continuing, the witness said that when Burbank started to leave the saloon, as ordered by Meuly, he, witness, took up the valise, and started up the street at a "lively" pace. He went into the alley on the north side of the Commercial hotel, expecting Burbank to pass. No person passing the alley the witness, after remaining there a few minutes, tossed the valise into the ante room of the hotel, and went back to the saloon. He then asked the bar keeper where Meuly was. The bar keeper pointed to the rear. Witness then went back to the hotel, got the valise, and went to his room, where he found Meuly. Witness asked Meuly if he was going to "skip." He replied that he was not, and asked witness to find the city marshal, to whom he wanted to surrender, and directed witness to say to the marshal that he had killed a man in self defense, and wanted protection, as he was afraid of being shot in the back. Witness then went to the Commercial saloon, which he found closed. The door was opened in a few moments and Marshal Boyard came out. He said something in Spanish to a hack driver, and was about to get into the hack when witness asked him if he was hunting the man who killed Douglas. He said that he was, and witness told him that he knew where he was. Boyard then led the way to the south end of the saloon, where witness told him that Meuly wanted to surrender, as he shot Douglas in self defense, but was afraid of being assassinated by Burbank, and wanted protection. Boyard promised to protect him, and witness led the way to his room. As they stepped into the room Meuly said: "Boyard, I killed a man down in the saloon. He is a stranger to me, but I had to do it in self defense." He then handed a pistol to Boyard, which he said he took from Burbank, and which Boyard could return to Burbank, or keep, as he thought best.

On going out of the room the parties, Boyard, Meuly and witness—met Lewis Christen, who guided them down a back stairway to a gate, out of which they went, and thence in a round about way to the jail, when Meuly delivered his pistol to Boyard. Witness asked Boyard if he, witness, could remain in the jail until morning. He replied that he would not undertake to grant that permission, as he and the sheriff were not on good terms. Witness then went with Boyard to his office and gave him his name as L. E. Riverton, and then went to the hotel to

get some sleep. He had not slept long when Boyard came back and arrested him as a witness, because, as he said, the populace demanded it upon the ground that witness, being a stranger, might "skip." The witness was then taken to jail. When the witness went to the hotel after Meuly's valise he asked the Mexican porter for a pistol, which the said porter refused to lend him. He wanted that pistol to protect himself in case he should become involved in the trouble. He had seen Burbank get a pistol and place it at his waist in easy reach. He had been referee for both parties to the pool game, and was as much afraid of having trouble with Meuly as with Burbank or Douglas. Witness remembered that, once or twice during the progress of the pool game, Douglas bantered Meuly to bet with him on the result. Meuly, however, paid no attention to Douglas, and no hard words passed between them about the game or the proposed bets. From the time that he got back to the saloon with the valise, from which Meuly secured the pistol, until after the shot was fired, the witness stood inside of the saloon, about one foot from the door. Meuly, Burbank, Douglas, Fernando Gomez and the witness were in the saloon at the time the shot was fired. Witness did not recognize Ayala, but remembered that he saw a man asleep in a chair in the billiard room before the shooting occurred. Witness left the saloon immediately in advance of Burbank. He did not then see Rogers nor any other person, at the door or out on the street. Rogers could not possibly have been at the door without witness seeing him, for the witness was himself *in* that door. Witness did not see Burbank after he got out of the saloon. Witness had never seen Douglas prior to the night of the shooting. Douglas was a much more powerful man than Meuly.

On his cross examination, the witness said that he returned to Illinois from Texas, first in October, 1886, and permanently in July, 1887. He married in Corpus Christi, under the name of L. E. Riverton, but before marriage told his wife that his right name was Reinhard. It was not true that the witness ever attempted to shoot his wife in Chicago, or that he ever committed forgery. Witness was twice indicted for complicity in this offense, and made his recognizance as L. E. Riverton. The witness was in jail for six weeks after the killing of Douglas. From that time until he went to Chicago, he lived in Corpus Christi and on Meuly's ranch. Meuly afterwards visited Chicago twice to see witness, for the purpose of getting

him to return and testify on his trial.   Witness's case was transferred to San Diego, where his recognizance was twice forfeited, the result of his unavoidable detention for one day en route to court.   The district attorney, after the forfeitures of the recognizance were set aside, dismissed the case against the witness.

The defense introduced in evidence the following diagram of the Commercial saloon, which was admitted to be correct:

N.

Lockers.

Ice
Box.

* Bar.

3 ft.    * Body.

W.    Safe.    E.

[Ground Plan.]

S.

The written testimony of Fernando Gomez was read in evidence by consent of the parties. It was to the effect that Meuly and Burbank finished the game of pool about five o'clock a. m., came to the bar, and Burbank asked witness for the bill due the saloon. Witness was in the act of handing the bill to Burbank, when Burbank remarked to Meuly that he, Meuly, owed him sixty dollars. Meuly then turned to a gentleman (Riverton) with him and told him to go to his room and bring him sixty dollars. Riverton then went out of the saloon, and Meuly followed him. A moment later Meuly returned and Riverton disappeared. About five minutes later Riverton reappeared at the door and Meuly went to him and out of the door, and almost immediately returned with a pistol in his hand. Douglas and Burbank were then standing close together. Meuly took his position in front of Burbank and Douglas, and told them that he knew what they were arranging—he was speaking to Burbank. Douglas started to speak, and Meuly told him not to move his lips. He started to speak again, and Meuly told him if he moved his lips he would kill him. Meuly then had his pistol out. Neither Douglas nor Burbank had a pistol out. Meuly then fired and Douglas fell. Burbank, as soon as Douglas fell, attempted to draw his pistol. Meuly then covered Burbank with his pistol, and with his other hand seized Burbank's pistol, and told Burbank he would kill him if he did not give up his pistol. Burbank struggled a moment and then told Meuly to take the pistol. Burbank then left the saloon, and Meuly took his coat from the counter, and with a pistol in each hand left the saloon by the back door. About two hours after Douglas went into the pool room he left it, remained out of the saloon about thirty minutes, and returned. No trouble arose in the billiard room, so far as the witness knew, prior to the last game of pool. Burbank used no language calculated to create a disturbance when, just before Riverton left the saloon he told Meuly that he owed him sixty dollars. Burbank, as was his custom, left his pistol behind the bar when the game of pool commenced. Witness did not see Douglas have a pistol at any time on the fatal night. Burbank got his pistol after the last game, and Meuly saw the witness hand it to him.

The defense closed.

James Orfila testified, for the State, that Antonio Ayala notified him of the killing of Douglas, and that he went at once

to his saloon, and thence to Boyard's house and woke him up. Douglas's body lay with the head towards the head of the counter, and his feet about five and a half feet from the west end of the counter. A cigar lay on the floor near or touching his right hand. The line of vision from the north gallery post of the Wilson hotel strikes the counter in the witness's saloon about ten feet from the door at the east of the counter, and about three feet from the west end. The whole space occupied by the body of deceased after he fell could be plainly seen from the north gallery post of the Wilson hotel.

The charges of the court held to be insufficient, and those requested by the defense and refused, and adverted to in the opinion, appear in the argument of the counsel for the appellant which follows:

*J. O. Nicholson*, for the appellant: In considering the question of the change of venue, we most earnestly request that the court will re-investigate the law upon said question, and for this purpose we refer the court:

I. To article 583, Code Criminal Procedure, which provides that "The credibility of the persons making the affidavit for change of venue, or their means of knowledge, may be attacked by the affidavit of a credible person, and the issue thus formed shall be tried and determined by the judge, and the application granted or refused as the law and facts shall warrant."

II. An examination of article 583, Code Criminal Procedure, shows that where the application is in conformity with article 578, Code Criminal Procedure, the same can only be defeated in two modes, viz, by an affidavit of some credible person attacking the credibility of defendant's compurgators, or their means of knowledge.

The credibility or means of knowledge of the persons making the affidavit for a change of venue being thus attacked, an issue is formed between the defendant and the State. What is the issue or issues in the case? In the case at bar, was it not the "means of knowledge" of defendant's compurgators?

This court said, in the case of Davis v. The State, 19 Texas Court of Appeals, 222, that "If the credibility of the supporting affiants is by proper affidavits made the issue, the evidence must be confined to this issue, and so with regard to the means of knowledge, if that be the issue formed." If the issue is formed on the credibility of the defendant's compurgators, could the ques-

tion of prejudice or no prejudice be tried under such an issue, and if not, why does not the same rule hold good on the issue formed on the "means of knowledge" of the defendant's compurgators?

III.    Prior to the passage of article 583, Code Criminal Procedure, there was no provision made for the formation of a written issue between the defendant and the State, but when the application of the defendant, supported by his own affidavit and those of at least two credible persons, residents of the county where the prosecution is instituted, for either of the following causes, the truth and sufficiency of which the court shall determine, one of which causes was prejudice (Pas. Dig., art. 2994); numerous decisions were rendered upon the admissibility of counter affidavits, or rebutting testimony as to the grounds of an application for a change of venue, some of which decisions (notably in the case of Walker v. The State, 42 Texas, 375, and Salinas v. Stillman, 25 Texas, 16) animadvert on the propriety of allowing an issue to be formed between the State and the defendant upon the question of prejudice or no prejudice, and we submit whether or not it was not the object of our learned law makers in enacting article 583, Code Criminal Procedure, to thereby eliminate the issue of prejudice or no prejudice, upon the hearing of an application for change of venue?    Otherwise, it simply becomes a contest between the applicant and the district attorney to get the greater number of persons to swear affirmatively or negatively upon the question of prejudice.    Supposing the persons making the affidavits to defendant's application had the means of knowledge sufficient to enable them to know the sentiment among the jurors of Webb county, as their own as well as the State's testimony shows that their opportunities for acquiring this knowledge was equal to that of the State's witnesses, are we not bound to admit, as stated by Chief Justice Roberts in the case of Walker v. The State, 42 Texas, 376, that "the law has been complied with which, prima facie, gave him a right to have the venue changed?"    If, under the issue formed as to the "means of knowledge" of defendant's compurgators, defendant's application is allowed to be resisted and overborne by testimony of a negative character, such as that in this case, made by a number of persons, the determination of defendant's right to a change of venue would, and did, descend into a struggle between him and the district attorney to get the greater number of persons to swear for and against the application, and the

stronger the prejudice against him, the more certain was his defeat as thus determined.

The fifteenth and twenty-fourth assignments are to the failure and refusal of the court to charge the jury upon the question of "manslaughter," "adequate cause," and "immediate influence of sudden passion."

Where the evidence, however slight, tends to prove facts from which the jury may deduce a finding of manslaughter, it is incumbent on the trial judge to give the law of manslaughter to the jury. (McLaughlin v. The State, 10 Texas Ct. App., 340; Johnson v. The State, 43 Texas, 612; Jennings v. The State, 7 Texas Ct. App., 350; Williams v. The State, Id., 396; Moore v. The State, 15 Texas Ct. App., 22; Nyland v. The State, 13 Texas Ct. App., 536.)

Where the evidence presents an issue favorable to the defendant, the trial court should not disregard it, but should accord to the accused fully and fairly the submission of the issue to the consideration of the jury. (Moore v. The State, 15 Texas Ct. App., 22, and authorities cited.) We believe that an inspection of the evidence as a whole, and especially that of L. E. Riverton, will conclusively show that the court should have submitted the question of manslaughter to the consideration of the jury. This the court having failed to do, the defendant prepared a charge on this question and asked that same be given to the jury. This the court refused to do. In the case of Williams v. The State, 7 Texas Court of Appeals, 396, the court says that where the facts create a doubt in the mind of the judge as to the necessity of a charge upon the law of manslaughter in a trial for murder, the doubt should be resolved in favor of the accused and such a charge given. In the case of Moore v. The State, 15 Texas Court of Appeals, 22, this court makes use of the following language: "It may be that a charge upon the law of manslaughter, in this case, would not have affected the result of the trial, or it may be that had all the rulings of the court and the charges of the court been correct and unexceptionable, the verdict of the jury would have been the same as it is, still we must look alone to the fact that the defendant is entitled to a fair and impartial trial in accordance with the fixed and certain rules of the law, and, when he has been deprived of his legal right, it does not rest within the sound discretion of this court to refuse him a new trial."

*Stanley Welch* and *G. R. Scott*, also for the appellant: In this case, self defense is an issue very clearly raised by the evidence, and, in a very contracted and limited sense, charged on by the court. We believe it was the right of the defendant to have the law upon this subject explained to the jury fully and correctly, in all the phases in which it might be applicable to the facts in proof. (Penal Code, art. 569, et seq.; King v. The State, 13 Texas Ct. App., 277; Edwards v. The State, 13 Texas Ct. App., 47; Kendall v. The State, 8 Texas Ct. App., 569; Reed v. The State, 11 Texas Ct. App., 509; Wheelis v. The State, 23 Texas Ct. App., 246.)

In the authority of Reed v. The State, supra, self defense is divided into two general classes—the perfect and imperfect right of self defense. The perfect right exists when the party availing himself of it acted from necessity, and was entirely and absolutely free from blame or wrong in occasioning or pro-ducing that necessity. The imperfect right exists where the party availing himself of it is placed in a situation where it becomes necessary for him to avail himself of it, and against a threatened danger or attack, superinduced to a limited extent by his own wrong, or hasty or inconsiderate or impulsive action; and the grade, measure or magnitude of that wrong, impulse or action is peculiarly within the province of the jury to determine.

The cited case of King v. The State is certainly stronger in facts that would permit the court to refuse and fail to charge manslaughter than the case at bar. The declarations of the defendant were about all that aided the doctrine enumerated of the "imperfect right of self defense" in that case. In this case there are the declarations of the defendant, as well as pertinent, positive evidence of such acts on the part of the deceased, taken with the surrounding circumstances, that make the rule that "the accused is entitled to be considered guilty or innocent from his own standpoint of reasonable apprehension of danger, and this by the jury trying him."

If cut off from this consideration by a failure of the court to charge upon the phase of self defense made by the evidence, we have the very condition of the case reprobated by the court in the same King case (9 Texas Ct. App., 556), where the trial court had assumed the proof so plenary on one side as to warrant him in refusing evidence of a legitimate character on the other side, and also (in error) induced said trial court to fail to charge

on the legal corollary of the imperfect right of self defense—manslaughter. By the authority of every case in our books, including this question and the doctrine of manslaughter, by the cardinal principles that separate, in our State, the province of the court from that of the jury, defendant was, under the evidence in this case, entitled to a charge of the court upon manslaughter. It was a fundamental error when the court failed to give it in his charge, for he is required to charge all the law of the case. It became an aggravated error when the defendant's counsel presented the charge upon that point and the court refused it. When the trial court failed still to grasp the principle of law so clearly enunciated in the cases quoted, all exposed to him upon the argument of the motion for a new trial, where this error was called to his attention, counsel for the defendant can only turn to the higher intelligence of a tribunal created for the correction of such errors, hold up its authorities and exclaim: *Fiat justitia, ruat cœlum.*

We submit that the court erred in charging the jury upon the law of self defense, as applied in this case, as follows: "Therefore, if the jury believe from the evidence that at the time of the homicide, that the deceased made any hostile demonstrations towards defendant, or any gestures as if to draw a weapon, under circumstances reasonably calculated to produce in the mind of the defendant a reasonable expectation or fear of death or great bodily injury, and that defendant actually believed that the deceased was about to murder or maim him, and that while said deceased was in the act of making such hostile demonstration, or such threatening gesture, defendant Meuly shot and killed deceased, then and in that event said Meuly would be justified in taking the life of said Douglas, and if you so find you will acquit him." (Penal Code, arts. 570 to 574; Smith v. The State, 15 Texas Ct. App., 338; Jones v. The State, 17 Texas Ct. App., 602; Kendall v. The State, 8 Texas Ct. App., 569; Cartwright v. The State, 16 Texas Ct. App., 473; Jordan v. The State, 11 Texas Ct. App., 435.)

The abstract proposition of law set forth in the above paragraph of the charge of the court, objected to at the time, must have necessarily misled the jury. Said charge limits and restricts the right of self defense against the acts or violence of deceased alone, when there is abundant evidence that the first menace came from Burbank, who asked for his pistol, and placed it in a position for use, joining with the deceased in a

demand that a certain gambling debt be paid before he, the de= fendant, left the house. The further aggression was when the defendant, armed only for his protection, advanced to Burbank, passing and ignoring the deceased, and with his pistol down at his side and a check in his fingers, said: "Burbank, you have twice demanded this money before I left the house; how will you have it?" Before Burbank can reply the deceased, Doug- las, says: "You will see d—d quick," and goes through the movement of seeking to draw a weapon. He is cautioned twice. Asked by defendant to throw up his hands, he not only fails, but desperately tugs at his pistol pocket, where a pistol is actually found after his fall.

We urgently insist that it was a vital error to thus limit the appearance of danger that would be likely to reasonably affect defendant's mind to the acts of deceased alone. All the evi- dence shows that the defendant was seeking to par himself with Burbank. Deceased, without provocation from the de- fendant, interferes and apparently assumes the offensive. What affected defendant's mind? Beyond doubt the dual or double danger; the acting of Burbank and Douglas together. It is evidenced most strongly by the res gestæ. As soon as Douglas fell, defendant turned upon Burbank, demanded his pistol, and succeeded in disarming him. If his heart was mur- derous, if there was malice, why not kill him too?

It is an analogous case to the case of Cartwright v. The State, supra, where this Court of Appeals held that there was error in the charge of the court, restricting his self defense to the acts of the deceased alone, where it was shown he was acting with others. Again, said paragraph is objectionable because of the restriction to a belief of murdering or maiming. The provis- ions of article 574 of the Penal Code, justifying homicide under an attack upon the person, declare that it must be such as pro- duces a reasonable expectation or fear of death or some seri- ous bodily injury. Maiming is a serious bodily injury, but all serious bodily injury is not maiming. It is defined (art. 507, Penal Code) as to wilfully and maliciously cut off or otherwise deprive a person of the hand, arm, finger, toe, foot, leg, nose or ear; to put out an eye, or in any way to deprive the person of any other member of his body. Under the paragraph ob- jected to, the court required that "defendant actually believed the deceased was about to murder or maim him," in order to justify a killing. It was a limitation and restriction of his

right; it was promptly, specially excepted to; charges correct-
ing it were asked by defendant and refused. Can this court
determine that it did not affect the jury, if it was error? We
think not, and as the trial court had a full opportunity of cor-
recting the error by exceptions, charges offered, and motion
for a new trial, and did not do so,.in so important a matter,
the cause should be reversed for new trial.

Again, the court erred in overruling the nineteenth subdi-
vision of the defendant's motion for a new trial, which is as
follows: "The court specially erred in giving to the jury as part
of the law in this case, paragraph B of his charge on self de-
fense as follows: 'If the jury find that defendant approached
deceased in a hostile manner, with a pistol in his hand, intend-
ing to take advantage of any move on the part of deceased,
knowing that such an act on his part might probably result in
death, either to himself or to the deceased, then and in that
event defendant would not be justified or excused in taking the
life of deceased, however great the necessity therefor.'" This
was a charge on the weight of the evidence and a reiteration
of a principle already embodied in the charge, and thereby
given undue prominence, and would deprive defendant of the
right of all defense, "however great the necessity therefor,"
contrary to the Bill of Rights and laws of this State. (See au-
thorities, supra, and Penal Code, art. 574; Hackett's case, 13
Texas Ct. App., 406; Burrill's case, 18 Texas Ct. App., 713.)

The court further erred in overruling the twentieth subdivi-
sion of defendant's motion for a new trial, as follows: "The
court fundamentally erred in giving to the jury the paragraph
marked 'C' of his charge on self defense, as follows: 'Again, if
the jury shall believe from the evidence that defendant made
the first hostile demonstration toward the deceased, and by his
own wrongful acts brought about and produced the necessity of
taking deceased's life, to avoid and prevent being himself killed,
then, and in such a case, he can not say the killing was in his
own necessary self defense.'" This is not the law of this State,
and it excluded from the jury the entire question of the intent
of the defendant in approaching Burbank and Douglas, and was
thus a charge directly on the evidence. And the same was an
erroneous reiteration for a third time of a rule of self defense,
whereby undue prominence was given to it, and misled the
jury. (Thurston v. The State, 21 Texas Ct. App., 248; Alex-
ander v. The State, 7 S. W. Rep., 867; White v. The State, 23

Texas Ct. App., 154; Green v. The State, 12 Texas Ct. App., 445; Lee v. The State, 21 Texas Ct. App., 242; Wheelis v. The State, 23 Texas Ct. App., 246; Tillery v. the State, 24 Texas Ct. App., 273.)

It will be readily perceived, by this court, that the line of instruction to the jury presented by the trial court, excludes from them entirely the consideration of the question of fact as to who was first aggressor; who provoked the difficulty; and what the intent of the defendant was on approaching Burbank and Douglas, with his pistol down by his side. There is no evidence in this case of a hostile demonstration on the part of defendant, or disposition on his part to provoke a difficulty. He was told that the money due by him to Burbank was wanted before he left the house; and this was accompanied by the (to him) hostile demonstration on the part of Burbank of getting a pistol and placing it handy in front, on the right side in his (Burbank's) pants.

Certainly defendant did no more, nor was he more culpable than Burbank, when he walked up the saloon, passing by Douglas, with a pistol down at his (defendant's) side, not pointed at any one. He asked about the money, how he (Burbank) wanted it, and the first aggression, the hostile motion and expression that caused the killing comes, not from defendant, but deceased. This is plain, not only from Riverton's testimony, but from that of Ayala and Gomez, who testified to words between Douglas and Meuly, while Burbank has no recollection of any.

In the case above cited of Alexander v. The State, supra, this court held that "in an indictment for murder where it appeared deceased began the affray in which the homicide took place, and there was no evidence that defendant had provoked it, it was error to charge concerning the law applicable to a contest provoked by a defendant with intent to kill, especially as the jury were not instructed (as in this case) as to the law where there is no such intention."

In analogy of facts, the case at bar is similar to the case of Lee v. The State, cited above. There the deceased passed the first insult and made the first hostile demonstration. The trial court in that case instructed the jury upon the law applicable to a case in which the combat was mutual and the defendant intended and did use a deadly weapon, and that the right of self defense could not be invoked. While the appellate court held it to be good law, they held that the facts were not so con-

clusive in support of that theory as to preclude all other infer-
ences ; and because said trial court refused to give the charge
asked by defendant, submitting the question of intent of the
defendant to free himself from supposed danger, which environed
him, the cause was reversed and remanded.

In the case of Thurston v. The State, 21 Texas Ct. App., 248,
this court approves the giving of a charge on the issue of pro-
voking a combat or producing the occasion in order to have a
pretext for killing his adversary or doing him some bodily harm,
but takes occasion to say, as to other issues presented and inti-
mately related, as follows: "While this proposition is correct,·
yet it is not absolutely certain that appellant provoked the diffi-
culty in order to have a pretext for killing his adversary.   There
is evidence (as in this case) presenting another theory which is
more favorable to the defendant, viz., that he did not provoke
the difficulty with a view of having a pretext to kill, but that,
if he, in fact, provoked the combat or produced the occasion, he
did so without any felonious intent, intending an ordinary bat-
tery merely ; and that, if this be the case, the killing would be
manslaughter, if done to save his own life.   And when we con-
sider, that in every instance in which the court instructed the
jury upon the law of self defense, that which was favorable to
the defendant was qualified by a proviso, by which the jury were
told that self defense could not be invoked, if the defendant
provoked the difficulty with a view to take the life of his adver-
sary, or willingly entered into the combat with intent to kill his
adversary, it became of the first importance to the rights of de-
fendant that his theory be presented to the jury, and let them
pass upon and decide which of the two was correct."

Again in that case it is said, "We are not attempting to de-
cide which theory is correct—that of the State or that of the
defense.   There being evidence presenting both, it was the
duty of the court to apply the law to each.  This was not done,
and we think this omission was very clearly calculated to in-
jure the defendant.   The judgment is reversed and the cause
remanded."

Volumes could not say more pertinently, cogently and forci-
bly in this case what is said for us in the above paragraph from
the Thurston case.  It is the law we have urged upon the atten-
tion of the trial court at every step of the trial.  It presents
itself in more than than a half dozen of our assigned errors.

As to the objection to the paragraph of the charge given for

reiteration, we have to say that all the cases condemn the practice of giving undue prominence to any feature of the law charged, by repetition. The effect on the jury is to lead them to believe such repeated principle the leading and controlling one of the case. In Tillery v. The State, supra, the court condemned the practice where, as in this case, the trial judge repeated the instruction complained of three times in his charge.

The court also erred in overruling the twentieth subdivision of the defendant's motion for a new trial, which is as follows: "The court fundamentally erred in charging the jury that 'if they believe from the evidence the defendant shot and killed deceased under such circumstances as are enumerated in either of said paragraphs A, B, and C, they would find him guilty of murder and the degree of such murder.' The court should have instructed the jury upon the law of manslaughter, as requested, and left the question of intent and adequate cause as matters of fact to the jury."

The said paragraphs A, B and C read as follows:

"A. The jury are further instructed that a party who seeks a difficulty with a deadly weapon, and who makes the first hostile demonstration or aggression, can not justify under the law of self defense. And likewise, a party who seeks and provokes a difficulty, with the intention of taking advantage of any hostile demonstration on the part of his adversary, would not be excused or justified in the eyes of the law for the homicide committed under such circumstances.

"B. And hence, if the jury find that the defendant approached the deceased in a hostile manner, with a pistol in his hand, intending to take advantage of any hostile move on the part of the deceased, knowing that such act on his part might probably result in death, either to himself or the deceased, then, and in that event, defendant would not be justified or excused in taking the life of deceased, however great the necessity therefor.

"C. Again, if the jury shall believe from the evidence that defendant made the first hostile demonstration toward the deceased, and by his own wrongful acts brought about and produced the necessity of taking the deceased's life, to avoid and prevent being himself killed, then and in such a case he can not say the killing was in his own necessary self defense.

Therefore a homicide committed under such circumstances as are enumerated in either of the last three preceding paragraphs

---

---

·of this charge, marked A, B and C, would constitute murder in one of the degrees, and a killing under such circumstances will be imputed to malice express or implied by reason of the wrongful act which brought it about or the malice from which it was done. And hence, if the jury shall believe from the evidence that defendant shot and killed deceased under such circumstances as are enumerated in either of said paragraphs A, B and C, they will then find him guilty of murder, and the degree of such murder as the facts shall warrant, and assess the proper penalty." (See authorities, supra.)

Finally, the court erred in overruling the twenty-second subdivision of defendant's motion for a new trial, which is as follows: "The court erred in refusing to give, at defendant's request, the following charge, as fully embodying the law of self defense, in a positive form, applicable to the evidence: 'The jury are instructed that if you believe from the evidence that it reasonably appeared to the defendant, Alexander Meuly, from the circumstances arising from the acts or words of H. A. Burbank and the deceased, H. Douglas, that the said defendant was in danger of serious bodily injury, or that his life was in danger, and that said defendant acted under such belief, then defendant was justifiable in defending himself against the circumstances constituting, in his mind, the apparent danger, to the same extent as if the danger had been real. If, therefore, you believe the defendant, in so defending himself against the apparent danger, acted under the reasonable belief that he was in danger of serious bodily injury, or that his life was in danger, at the time he shot and killed said Douglas, under the law he was justified, and you will acquit him.' " In view of the proof adduced upon the trial, as disclosed by the statement of facts, we submit that the above special instruction should have been given.

*W. L. Davidson*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. This voluminous record contains fourteen bills of exception reserved by defendant to rulings of the court at the trial, and twenty-four assignments of error submitted on this appeal as grounds for reversal of the judgment. Our conclusion as to the course necessary to be taken in the disposition of the case on this appeal renders it unnecessary to discuss but one or more of these supposed errors, as

they are of a character not likely to arise on another trial in the court below. Some of them become important in view of another trial, and to such alone we propose to confine our discussion.

I. Appellant moved for a change of venue in the case, and based his motion upon the first ground named in the statute (Code Crim. Proc., art. 578); that is, that there existed against him so great a prejudice in the county that he could not obtain a fair and impartial trial. His application was controverted by the district attorney under the provisions of article 583, Code Criminal Procedure, and many witnesses were permitted to be examined on both sides as to the existence or non existence of "prejudice" in the county. It is urgently insisted that such testimony was inadmissible and contravenes the obvious purpose and intent of article 583, which, it is contended, limits and restricts the matters to be investigated, solely to the credibility and means of knowledge of the defendant's compurgators in the application. In other words, that, if the credibility and means of knowledge of the compurgators are alone authorized to be attacked, that this can not be done by proof generally of the non existence of prejudice, and that in such a contest it is error to go into a general investigation as to the existence and non existence of prejudice.

Now, what was the sole issue presented by defendant's application and the supporting affidavits of the compurgators? It was the existence or non existence of prejudice. Their means of knowledge upon this matter was attacked. To show that such prejudice did not exist manifestly tends most strongly to prove that they did not possess correct means of ascertaining the truth of the matter. Under this issue as to "the means of knowledge" of the compurgators, it has been more than once decided that the "defendant would have the right to prove the existence of the prejudice by any witness besides the affidavit of his compurgators; and, on the other hand, the State would have the right to prove that no such prejudice did in fact exist. The supporting affiants could be thoroughly tested as to their means of knowledge by either party." (Davis v. The State, 19 Texas. Ct. App., 201; Pierson v. The State, 21 Texas Ct. App., 14; Smith v. The State, Id., 277; Scott v. The State, 23 Texas Ct. App., 521; Henning v. The State, 24 Texas Ct. App., 315.)

II. In our opinion the most serious questions presented for our adjudication are those calling in question the sufficiency of and the correctness of the charge of the court.

A general and, as we believe, a most humane and just rule in the trial of one charged with murder is that the jury should, as far as possible, judge of the facts surrounding the homicide from the standpoint of the defendant. In order to do this properly they must have submitted to them in the charge of the court all the law legitimately and fairly arising upon the evidence which he has adduced in his defense. If the evidence be legal, competent and admissible, then, when the court has admitted it, whether the court may believe it true or false makes no difference, it becomes part of the case, and the jury alone have the right to say, under appropriate instructions pertinent to it, what degree of credibility shall be accorded the witnesses who have testified, and what weight shall be given to the testimony; and they also have the right to pass upon all issues legitimately arising upon such testimony. The statute enjoins it that the charge shall distinctly set forth the law applicable to the case. Not alone the case as made by the evidence for the prosecution— the case as made by all the evidence; and especially is it the duty of the court to submit in its charge the law applicable to any favorable evidence comprising defensive matter in behalf of the accused. (Burkhard v. The State, 18 Texas Ct. App., 599.) "A defendant in a criminal case has a right to have instructions given, based on the testimony of his witnesses, although contradicted by the testimony of the prosecution." (Partlow v. The State, 4 S. W. Rep., 14.) Without discussing *seriatim* the several errors complained of as to the charge of the court in this case, and so ably argued in the briefs of counsel for appellant, we propose to set out substantially the testimony of the principal witnesses for defendant, and from that testimony deduce such applicable rules of law as, in our opinion, have been misconceived and overlooked in his instructions by the learned trial judge, and to which the defendant was entitled.

One L. E. Riverton, alias Reinhard, was the main witness for the defendant, and he testified to his previous acquaintance with defendant, and the circumstances which brought about a game of "pin pool" between one Burbank and defendant, at the Commercial saloon, in Laredo, where the homicide occurred, between four and five o'clock on Monday morning, March 29, 1886. This game commenced about nine o'clock Sunday evening, and Riverton was asked by both parties to count the game; which he did. He says: "About one a. m. a stranger came in and sat down at the pin board; this was Douglas,

who was drunk. He made some remarks about the game from time to time, and I was annoyed thereby, but Burbank said: 'Pay no attention to him.' At about two o'clock a. m., I noticed that Mr. Burbank was not playing fair. I suggested to Meuly that we go to bed and refused to count the game longer, and went and sat down. At about four o'clock a. m., Meuly was indebted to Burbank sixty dollars, and said to Burbank: 'I will play you one more game, for sixty dollars.' Burbank said: 'No; I will play you for fifty dollars. I ought to have ten dollars for staying up all night.' Meuly agreed to play for fifty dollars, and said he would give Burbank a check on Corpus. I was asked to keep the tally for them for these last games, which was to be the best two out of three. Burbank won the first horse. Meuly won the second horse. At the commencement of the third game Meuly said: 'Burbank, give the balls a square shake.' The game proceeded, and when Burbank had made thirteen he shot at the three pin, knocked it down and also the one pin, and exclaimed: 'Busted!' He shot again and made some pins, and Meuly exclaimed: 'I will make pool soon.' Burbank had fifteen counted on his string, and, after some conversation, knocked down the four and three pins, and said: 'Pool.' Meuly said that was a mistake. I counted up seven and the fifteen, making twenty-two, and Burbank pulled out the nine ball from his pocket and threw it on the table. Meuly said that must be a mistake. He took up his and Burbank's ball and the bottle, and let the balls run out on the west side of the table, counting out fourteen balls, and said: 'This is evident that something is wrong.' At this time I was seated at the east side of the billiard table, and I noticed Burbank take another ball out of his pocket, and, concealing it in his hand, said: "Are there only fourteen balls there?' and extended his hand and raked in the fourteen balls, counted all the balls together, and said: 'There are fifteen balls there.' 'Yes,' said Meuly, 'there are fifteen now. I have enough of this game.' *Douglas* spoke up and *said: 'Burbank, get your money.'* Burbank replied: *Yes, I want the money before you leave the house.'* Meuly said: 'You will get your money,' and he picked up his coat and walked out behind the bar and washed his hands. Burbank, Douglas and myself followed Meuly, and Burbank asked Meuly if he would take something to drink. Meuly replied that he did not care for anything. They were in front of the bar. I was in rear of all, about the center of the

room. Meuly had his side to the bar. *Douglas said to Bur-bank:* '*Get your money before he leaves the house,*' *and Bur bank said:* '*Yes, he wanted it before he left the house.*' At the same time Burbank said something to the bar keeper in Spanish, and the bar keeper handed him a revolver. At the time Bur-bank received the pistol, Meuly looked around and saw it. Meuly then said to me: 'Will you please step up to my room and bring me my valise; I want to pay him the money I owe him.' I replied 'Certainly,' and started after it." Here the witness tells of his getting the valise and returning with it to the saloon. He then proceeds: "I took the valise into the threshold of the door of the Commercial saloon. Meuly stepped from within into the doorway, took out a key and opened the valise. He first took out a paper which looked like a check, and with his right hand he took out a revolver, and left the valise open in front of me. Douglas was standing at the counter nearest the door, and Burbank beyond him. Meuly, with the pistol hanging down by his side, in his right hand, went past Douglas and up to Burbank, and said: 'Burbank, you demanded this money twice before I left the house; how do you want it?' Douglas was leaning with his right arm on the counter. I think he must have seen the pistol. *He said:* '*You will see d——d quick,*' *and ran his right hand into or on his hip pocket.* Meuly wheeled on him and threw his revolver down on him, and touched him on the lappel of his coat with his left hand and said: 'My friend, this is something that does not concern you, and I wish you would throw up your hands.' Douglas did not pay any attention, nor did he say anything, but kept pulling at something he had in his pocket. Meuly waited a moment and said: 'Throw up your hands, or I will have to cut you down.' Douglas made another jerk, and Meuly fired and shot him. Meuly wheeled on Burbank and said: 'Burbank, you have a gun on you; I want it;' and threw his pistol down on him. Burbank said he was a deputy, and had a right to carry it. Meuly said: 'I don't give a God d—n what you are; give up your gun.' With this, Burbank made a move-ment to get ready to [shoot] him, and Meuly said: 'Stand up there, or I will shoot the head off of you.' Burbank then threw his hands up, and Meuly reached over and took Burbank's pis-tol and said: 'You get!' and Burbank turned about half way towards me and got."

This is the testimony of the defendant's main witness. It

was in evidence that Douglas's dead body was examined in a short time after the killing, and a pistol was found in his right hand hip pocket. Burbank, the principal State's witness, says that during Riverton's absence (after Meuly's valise) "Meuly walked up and down the room in front of the door. In a few moments I saw something handed into the door to Meuly."

III. Under our law a party has the right to defend himself against any assault or threatened assault made upon his person, calculated to inflict death or serious bodily injury. (Hunnicutt v. The State, 20 Texas Ct. App., 634.) And it is not essential to his perfect right of self defense that the danger be real or in fact exist. It may be only apparent and not real. If it reasonably appear from the circumstances of the case that danger existed, the person threatened with such apparent danger has the same right to defend against it, and to the same extent, that he would have were the danger real. (Willson's Crim. Stats., sec. 978; Tillery v. The State, 24 Texas Ct. App., 251.) This perfect right of self defense, however, may be destroyed entirely or abridged by the acts of the party. For, if a party by his own wrongful act brings about the necessity of taking the life of another to prevent being himself killed, he can not say that such killing was in his necessary self defense, but the killing will be imputed to malice express or implied by reason of the wrongful act which brought it about, or malice from which it was done. A person can not avail himself of a necessity which he has knowingly and wilfully brought upon himself. (Willson's Crim. Stats., sec. 981; Allen v. The State, 24 Texas Ct. App., 216.)

But, whilst this is the rule as to a perfect right of self defense, such rule is limited by the intention of the party producing this necessity to take life. If his intention was not felonious, then the homicide which his necessity compelled will not be murder. For, as is well said by the supreme court of Missouri in Partlow's case: "Indeed, the assertion of the doctrine that one who begins a quarrel or brings on a difficulty with the felonious purpose to kill the person assaulted, and accomplishing such purpose, is guilty of murder and can not avail himself of the doctrine of self defense, carries with it in its very bosom the inevitable corrollary that, if the quarrel be begun *without a felonious purpose*, the homicidal act will not be *murder*. To deny this obvious deduction is equivalent to the anomalous as-

sertion that there can be a *felony* without a *felonious* intent;
that the *act* done characterizes the *intent* and not the *intent* the
*act.*" (State v. Partlow, 4 S. W. Rep., 14; Reed v. The State,
11 Texas Ct. App., 510; Peter v. The State, 23 Texas Ct. App.,
684.)

Now, if the party's right of self defense, as to its extent—
that is, whether perfect or imperfect—depends upon the intent
with which he provoked the difficulty, and the intent is a fact
to be found by the jury, then it seems clear that the charge of
the court, in cases where the evidence creates any doubt as to
the character of the intent, should always instruct the jury as
to the distinction between the right of perfect and imperfect
self defense as applicable to the particular act committed by the
accused, and the extent of his liability when measured by it.

If, in the case in hand, Meuly did not provoke a difficulty with
the purpose and intent to kill either Burbank or Douglas, but went
to them, after getting his check and pistol from the valise, with
the purpose and intent of settling the debt he owed Burbank,
and an altercation ensued in which they or either of them, by
words accompanied by acts, or by acts alone, created a reason-
able apprehension in his mind of death or serious bodily injury,
and, acting under such reasonable apprehension and appear-
ances of danger, he shot and killed Douglas, he believing the
parties were acting together, or Douglas being the party making
the demonstrations creating his apprehensions, then he would
be justified on the ground of necessary self defense. (Bonnard
v. The State, 25 Texas Ct. App., 174). When there are more
assailants than one, the slayer has the right to act upon the
hostile demonstrations of either one of them, and to kill either
of them if it reasonably appeared to him that they were pres-
ent acting together to take his life or do him serious bodily
injury. (McLaughlin v. The State, 10 Texas Ct. App., 340; Cart-
wright v. The State, 16 Texas Ct. App., 473; Jones v. The State,
20 Texas Ct. App., 665; Bean v. The State, 25 Texas Ct. App.,
347.)

Of course, in determining Meuly's intent, the jury will take
into consideration the fact of Meuly's arming himself with a
pistol, and also the language which he used as tending to pro-
voke the difficulty. Was the language calculated to provoke a
difficulty? Upon approaching them, if his act was to throw his
pistol down upon them, accompanied by the demand, "throw
up your hands," there can be no question as to the provocation

and his intention to produce a deadly conflict. If, however, having the check in one hand and the pistol hanging by his side in the other, his remark was, "you have twice demanded that I pay you your money before leaving the house, now how will you take it?" was that such language and conduct as would likely bring on a fatal rencontre? If not, then he is not liable as having provoked it. The rule is that "the right of self defense is not impaired by mere preparation for the perpetration of a wrongful act, unheralded and unaccompanied by any demonstration, verbal or or otherwise, indicative of the wrongful purpose." (Cartwright v. The State, 14 Texas Ct. App., 486; Cunningham v. The State, 17 Texas Ct. App., 89; White v. The State, 23 Texas Ct. App., 155.)

IV. As to manslaughter: If from the words of Burbank and Douglas, accompanied by Burbank's conduct in getting and putting his pistol conveniently for use on his person, Meuly really believed that they did not intend that he should leave the house until he paid the money, and he was thus placed in restraint of his liberty, and, knowing that he could not pay the money, and believing they would decline the check and still refuse to let him go, he shot in order to effect his release from the illegal restraint thus imposed, the offense would be manslaughter, and not murder. "An illegal attempt to restrain a man's liberty, even under color of legal process, is such provocation as to reduce the offense to manslaughter. This holds where a man is injuriously restrained of his liberty, as where a creditor stood at the door of his debtor with a drawn sword to prevent him from escaping while he sent for a bailiff to arrest him." (Whart. on Hom., sec. 447.) A citizen authorized to stand upon his individual rights may oppose force to force in the prevention of an attempted wrong, and when illegally restrained of his liberty may not only oppose force to force, but can increase that force even to the killing of his adversary, if necessary to prevent the attempted wrong. (Ross v. The State, 10 Texas Ct. App., 455; Willson's Crim. Stats., sec. 976.)

Again, if Meuly, not intending to provoke a contest with intent to kill (Code Crim. Proc., art. 603), but under the influence of terror, produced by the acts and conduct of Burbank and Douglas, procured his pistol as a means of defense in case they should attack or restrain him upon his failure to pay the money before he could leave the house, and their acts, words and con-

duct when he asked how they would have the money was such
as to arouse either of the emotions known as anger, rage, sud-
den resentment or terror, rendering his mind incapable of cool
reflection, and under the immediate influence of the sudden
passion thus aroused he shot and killed Douglas, then his of-
fense would be manslaughter, and not murder. (Penal Code,
arts. 593, 594.)   Where the evidence tends to show that passion
was aroused by an adequate cause, the question whether the
act of killing was caused by the passion is for the jury and not
the court to pass upon. (Mackay v. The State, 13 Texas Ct.
App., 360; Willson's Crim. Stats., sec. 1009.)   In this case the
court refused, though requested, to charge upon manslaughter.

Because the charge of the court did not sufficiently present
the law applicable to the theories legitimately arising upon the
evidence adduced in behalf of the defendant, the judgment is
reversed and the cause remanded for another trial.

*Reversed and remanded.*

Opinion delivered October 27, 1888.